No. 05-960C
(Judge Bush)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STATES ROOFING CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S MOTION TO DISMISS
APPENDIX VOLUME ONE

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRYANT G. SNEE
Assistant Director

OF COUNSEL:

DAVID KOMAN
Department of the Navy

DAVID B. STINSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St.
Washington, D.C. 20530
Tele: (202) 307-0163
Fax: (202) 514-8624

December 30, 2005

Attorneys for Defendant

# INDEX TO APPENDIX

Page(s)

## APPENDIX VOLUME ONE

September 1, 2004 Final Decision . . . . . . . . . . . . . . . . . . 1

## APPENDIX VOLUME TWO

September 1, 2004 Final Decision (cont.) . . . . . . . . . . . . 27

Final Decision no. L04-015 Certified Mail Receipt dated September 3, 2004 . . . . . . . . . . . . . . 32

September 30, 2004 Final Decision . . . . . . . . . . . . . . . 34

September 30, 2004 Final Decision (facsimile copy) and email . . . . . . . . . . . . . . . . . 36

ASBCA Rules (selected portions) . . . . . . . . . . . . . . . . . 42

November 23, 2004 Notice of Appeal . . . . . . . . . . . . . . . 48

November 29, 2004 Notice of Docketing . . . . . . . . . . . . . 53

December 3, 2004 Notice of Appeal . . . . . . . . . . . . . . . 54

## APPENDIX VOLUME THREE

December 3, 2004 Notice of Docketing . . . . . . . . . . . . . . 63

November 23, 2004 Notice of Appeal indicating receipt by contracting officer on November 29, 2004 . . . . . . . . . . . . . . . . . . . . . . 64

SRC ASBCA Complaint . . . . . . . . . . . . . . . . . . . . . . . 69

## APPENDIX VOLUME FOUR

Government Answer . . . . . . . . . . . . . . . . . . . . . . . . 86

November 16, 2005 letter to ASBCA (with attachments) . . . . 106

DEPARTMENT OF THE NAVY
NAVAL FACILITIES ENGINEERING COMMAND
ATLANTIC
6506 HAMPTON BLVD
NORFOLK VA 23508-1278

TELEPHONE NO:
(757) 322-4071

IN REPLY REFER TO:
FINAL DECISION L04-015
N62470-97-C-8319
AQ213:RDR

01 SEP 2004

CERTIFIED MAIL - RETURN RECEIPT REQUESTED

States Roofing Corporation
1215 St. Julian Avenue
Norfolk, Virginia 23504

Gentlemen:

The Resident Officer in Charge of Construction (ROICC), Sewells Point Area, has forwarded your claim in the amount of $1,681,238.00 and 132 calendar days under Contract N62470-97-C-8319, Building W-143 Roof Replacement, Wall Repair and Painting, Naval Station, Norfolk, Virginia.

After review of the material presented, the Contracting Officer makes the following findings of fact:

You were awarded this contract on 7 August 2000 in the amount of $2,370,000.00, with a completion date of 17 August 2001. Through Modification P00007, the contract amount was increased to $2,837,260.00 and the contract completion date extended to 15 November 2001. The contract work was complete on 6 November 2001.

By letter dated 18 April 2003, Vandeventer Black LLP, Attorneys at Law, submitted a claim on your behalf for additional compensation involving 67 different claim items with no total dollar amount indicated and 132 calendar days. The ROICC had issued Modification P00007 on 7 April 2003, prior to receiving this claim, compensating you for 40 of those items in the negotiated amount of $467,260.00, and extending the contract time for completion 45 calendar days. After you declined to sign the modification, it was reissued on 23 April 2003 as a Unilateral Modification.

You submitted a "supplement" to this claim, dated August 25, 2004 and faxed to the Navy on August 26, 2004, which alleges that additional research has revealed that your initial claimed

001

amount was too low. As this supplement was not submitted until just before the date set by the ASBCA for issuance of the Contracting Officer's Final Decision, September 1, 2004, the Navy will treat the supplement separately and will not address it in this decision.

Following is a discussion of the various claim items with the Government response: (Note: For identification purposes, the Contractor Proposal No. is listed as "CP#")

**1. Crane (Cranelift versus Elevator) - CP # 1 - $427,465.00** Entitlement amount claimed due to the changed condition caused by the unavailability of Elevator No. 6. The change required you to provide a mobile crane to move material to and from the roof at your expense, in lieu of using the Elevator as specified.

Pertinent contract provisions are:

FAR Clause 52.243-4 CHANGES (AUG 1987). Under the Changes Clause the Government has the unilateral right to direct changes within the general scope of the contract and if any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.

SPECIFICATION SECTION 01140 WORK RESTRICTIONS, Paragraph 1.5 Special Scheduling for Occupied Buildings, states, "… Elevator #6 will be available for material handling subject to base regulations. Use of the building elevator shall require maintenance and repair of damage due to contractor's use."
Paragraph 1.10.a "Building W-143 will remain in operation during the entire construction period and the Contractor shall conduct his operations so as to cause the least possible interference with the normal operations of the Activity."

SPECIFICATION SECTION 01500 TEMPORARY FACILITIES AND CONTROLS
Paragraph 3.3 "…Melt kettles for tar, asphalt, and similar materials shall not be closer than 25 feet to the buildings or combustible materials."

> NAVFAC Drawing (Dwg) No. 4384980, Sheet A3, General Work Note 14, "The movement of debris, materials and equipment to and from the roof level shall be by contractor provided hoist."

The Government issued undefinitized modification P00003 in the not to exceed (NTE) amount of $226,000.00 (funded at 50% of the NTE amount, $113,000) as partial compensation for the change. The modification was not bilaterally definitized because agreement could not be reached on direct costs. Unilateral Modification P00007 included $213,949.00 for this issue, bringing the total compensation to $326,949.00. In determining the amount to be granted in P00007, the ROICC made several adjustments to your proposed figures. First, the ROICC deleted the charges claimed for forklift rental and forklift operator labor hours. The Government position is that, had the change not occurred, you would still have used a forklift for unloading trucks, loading material onto and off of Elevator #6, and for staging materials on the roof. You were also paid for 248 hours of "stand-by" crane time, both rental charges and direct labor (an amount you later claimed in Item #61). The total labor rental figures were then appropriately burdened to reach the modification amount of $326,949.00.

Therefore, no additional entitlement is due for this issue.

**2. Ambiguous Specifications for Treatment of Parapet Wall - $147,875.00, CP # 2 and 3**

You claim that the Government provided ambiguous specifications and drawings causing you to assume that the parapet walls on W-143 need only be painted, instead of being covered with a 3-ply waterproof membrane. Since the Government required the installation of the membrane, you allege that you should be compensated for the additional cost of installing a bituminous membrane on the backside of the parapet wall, as you feel that you should have been allowed to paint the parapet in accordance with Specification Section 09900, Paints and Coatings.

Pertinent contract provisions are:

> FAR Clause 52-236-21 SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION
>
> SPECIFICATION SECTION 07511, BUILT-UP ASPHALT ROOFING
> Paragraph 2.2.2 Felts
> Paragraph 2.2.3 Primer
> Paragraph 3.2.1 Priming of Surfaces

Paragraph 3.5 Flashing

SPECIFICATION SECTION 09900, PAINTS AND COATINGS
Paragraph 1.9.3 Exterior Painting "… Also included are existing coated surfaces made bare by cleaning operations."

NAVFAC Dwg No. 4384978, Sheet A2: *Demolition Notes*, provide notes keyed to the plans regarding demolition work items. *Demolition Note* 23 states: "Existing concrete parapet wall to remain. Remove existing flashing, and granule surfaced sprayed on membrane top coat, granule surfacing and flashing from inside face and top of parapet wall down to bare concrete surface, repair wall as required, (typical for all parapets)"
*New Work Note 28* states: "Existing painted concrete-prep/paint, color No. 1."

NAVFAC Dwg No. 4385014, Sheet A37, Detail 1 Typ. Bldg. Exp. Joint Detail @ Penthouse Walls. Provides detail where an existing penthouse is next to a building expansion joint and indicates the parapet wall beyond. Shows New Work Note 25 as "Waterproofing membrane (3 ply)" on the parapet beyond.

NAVFAC Dwg. No. 4385011, Sheet A38, Detail 1 Typical Flashing Detail at Roof Drains and Parapet Walls. Shows New Work Note 2 as "Waterproofing membrane (3 layers)" on the parapet wall.

NAVFAC Dwg. No. 4385017, Sheet A40 contains another detail of the parapet, entitled "Typical Exp. Joint Detail @ Parapet & PH", which also indicates the need for a "waterproof membrane (3 layers)"

In order to create this alleged ambiguity, you rely primarily upon a listing of Drawing Notes contained on Sheet A2 of the drawings, specifically citing Demolition Note 23, which says that the parapet walls should be cleaned "down to bare concrete". You then point to Specification Section 09900, Paragraph 1.9.3, which states that "existing coated surface made bare by cleaning operations" should be painted.

However, your interpretation ignores the fact that there are several detailed drawings indicating that a 3-ply waterproof membrane was to be installed on the back of the parapet walls. Specifically, Sheet A38 of the drawings contains a large diagram entitled "Typical Flashing Detail @ Roof Drains & Parapet

Walls", which indicates, in great detail, the exact method of repair to be used for the parapet walls. This drawing graphically indicates that a three-layer coating is required on the wall and provides a "new work note" explaining that the coating is a "waterproofing membrane (3-layers)." Sheet A40 contains another detail of the parapet, entitled "Typical Exp. Joint Detail @ Parapet & PH", which also indicates the need for a "waterproof membrane (3 layers)".

You indirectly acknowledge these drawings, but you concentrate on the fact that the note discussing the waterproof membrane uses the term "3-layers". You then claim that the term "layers" can be used to discuss painting. You overlook, however, the existence of the term "waterproof membrane" in the same note. "Waterproof membranes" and "membranes" are not terms used to describe paint. Moreover, the Construction Dictionary defines "waterproof membrane" as a "system of water proofing masonry walls with layers of felt, canvas or burlap and pitch". Specification Section 07511, Paragraph 2.2.2 Felts, directly ties the work notes to the specifications. The contract clearly shows a 3-ply system in the drawings and this system is defined in the specifications. In order to support your reading of "layers" as referring to paint, you had to ignore the drawing itself, which physically indicates three layers of substances, something not done when demonstrating paint. Such an interpretation is not reasonable in light of the data set forth above, as has been explicitly stated by the Armed Services Board of Contract Appeals (ASBCA), which has said that "an interpretation which makes a contract provision void or superfluous is not reasonable."

Finally, to the extent that the specifications do not discuss the parapet walls and waterproof membranes, such an omission is not fatal to the Navy. FAR Clause 52.236-21, Specifications and Drawings for Construction, holds that "anything mentioned in the specifications and not shown in the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both." Here, the drawings specifically indicate the existence of the waterproof membrane on the parapet walls.

Therefore, no entitlement is due.

**Item 3. Deletion of Wood Nailers - CP # 4 - ($17,966.00) (Actual claim is the difference between the credit of $33,105.00 issued in P00007 and your revised proposed credit of $17,966.00 - $15,139.00)**

005

You disagree with the amount of credit due the Government for deletion of the wood nailers at the parapet perimeter and expansion joints. During good faith negotiations, agreement was reached on a credit in the amount of $33,105.00, utilizing a material rate of $1.61/LF and a labor cost of $0.58/LF for 8,484 LF of material, utilizing audited rates.

Modification P00007, Item a. under "Definitization of P00001" included a credit of $33,105.00 for this deletion. You subsequently changed your position, and resubmitted a credit proposal in the amount of $17,966.00, derived from R.S. Means. You used the line item for 1x3 furring strips versus 2" dimensional lumber at varying widths up to 10" wide, a more accurate description of the referenced work. The line item you utilized is not a fair representation of the deleted work, given that the wood was to be installed on a concrete surface. Your revised proposal is based on the wrong site conditions, and you have presented no justification as to why your negotiated position is no longer valid.

Therefore, no additional entitlement is due.

**Item 4. Expansion Joint Installation Roof K – CP # 9 - $4,255.00**
Modification P00007 provided total compensation for installation of the expansion joint at Roof K, Item a. under "Definitization of P00002", in the amount of your proposal #9 - $4,255.00; therefore, no additional entitlement is due.

**Item 5. Modify 3,214 LF of Roof Insulation for Concrete Cant - CP # 18R - $3,813.00**
Total compensation was provided in Modification P00007, Item a., page 4, in the amount of $3,813; therefore, no additional entitlement is due.

**Item 6. Hidden Concrete Slab Areas – CP # 's 19R and 20 - $871.00 ($436 and 435 respectively)**
Modification P00007 provided total compensation in the amount of your proposal Nos. 19R and 20, $871.00; therefore, no additional entitlement is due.

**Item 7. Cover 10-inch Hole in Roof I - CP #23 - $335.00**
Modification P00007, under Definitization of P00002, Item i., provided total compensation for this, CP #23, and for CP #24 (Item 8 below) in the total amount of $664.00 ($335 + $329). No additional compensation is due.

**Item 8. Cover 8-inch Hole in Deck - CP #24 - $329.00**
As shown in Item 7, Modification P00007, Item i. Definitization of P00002, provided total compensation for these two items; therefore, no additional entitlement is due.

**Item 9. Repair Spalled Concrete - CP # 27 - $508.00; CP#45 - $795.00; and CP#67R - $98,361.00**
Total compensation for these item was provided in Modification P00007, page 4, as follows:
CP #27 - Item b. in the amount of $508.00
CP #45 - Item d. in the amount of $795.00
CP #67 - Item f. Increased amounts in Modifications P00005 and P00006 due to DCAA Audited Rate Adjustment from $92,000.00 to $98,361.00. Therefore, no additional entitlement is due.

**Item 10. Double Cylinder Locks and Related Door Changes - CP #31 - $1,728.00**
Modification P00007, Item b. under Definitization of P00002, provided total compensation in the amount of $1,728.00. No additional entitlement is due.

**Item 11. Raise Feeder Conduit - CP #34 - $1,403.00**
Item h. of Modification P00007 Definitization of P00002, provided total compensation in the amount of $1,403.00; therefore, no additional entitlement is due.

**Item 12. Elastomeric Coating - CP #35 -($8,230.00) Credit**
This credit in the amount of $8,230.00 was provided for in Modification P00007, Item c., Definitization of P00001. Therefore, no additional entitlement is due.

**Item 13. Remove Protrusions - CP #37 - $1,449.00**
Modification P00007, Item d., Definitization of P00002, provided total compensation for this item in the amount of $1,449.00. No additional entitlement is due.

**Item 14. Delays Caused by Tractor-Trailers - CP# 41 - $1,228.00**
You contend that tractor-trailers blocked access to your staging area at Building W-143 for one hour causing you to halt work.

Pertinent contract provisions are:

SPECIFICATION SECTION 01140 WORK RESTRICTIONS
Paragraphs 1.3.1, 1.5 and 1.10
SPECIFICATION SECTION 01500 TEMPORARY FACILITIES AND CONTROLS

007

Paragraphs 1.4.2.1 and 3.1.1.4

The contract specifications clearly state that W-143 was to remain in operation during the course of the work and, that activities involving the building had to be coordinated with the Contracting Officer. Specification Section 01140, Paragraph 1.3.1 requires the Contractor to request, in writing, permission to interrupt station roads at least 15 days in advance. The contract also requires the Contractor to submit a traffic control plan indicating how traffic would be affected and outlining the method of barricading that the contractor would use to prevent public access. You never provided any of this information and did not have your area barricaded. According to the contract documents this is a contractor responsibility.

Therefore, no entitlement is due.

**Item 15. Lost Time Due to Fire Drills - CP #42 - $1,005.00** You allege that an unannounced fire drill was conducted at Bldg. W-143 on February 26, 2001, which caused you to lose one hour of production time during this "unannounced suspension". You add that had the Government desired to conduct such a drill, which is for the benefit of the occupants and not part of States' approved safety plan, it was required to coordinate the same with you, so you could have then scheduled around the fire drill. Since the Government failed to make this simple coordination, you claim it is responsible for the cost of the resulting job shutdown.

The Government agrees that if this had been a planned fire drill, then the Government should have notified you in advance to avoid any additional cost or problems.

However, this was an unplanned actual event caused by the shearing off of a sprinkler head by subcontractors working for a contractor on a separate contract within the building. In this instance, the Government acted under Base Regulations and in its Sovereign Capacity in requiring occupants within the facility, and all contractors, to vacate the facility until the source of the alarm was identified and the building deemed to be safe. The Boards have held that when a bomb threat or a fire alarm "were not the fault of the Government," that the events did not constitute a compensable delay.

Therefore, no entitlement is due for this item.

**Item 16. Removal of Hot Wires Roof G - CP #43 - $791.00**

Modification P00007 provided total compensation, Item f. under Definitization of P00002: "Remove wires and provide steel plate over penetration on roof cell "C" $791.00". No additional compensation is due.

**Item 17. Chipping out Concrete Cricket, Roof G - CP #44 - $441.00**
Total compensation of $441 was provided for this in Modification P00007, Item c., page 4; therefore, no additional compensation is due.

**Item 18. Remove Antenna Bracket - CP #47 - $834.00**
Claim for removal of an abandoned antenna bracket encountered on PH 7, Roof G, and plugging the hole, as this was not shown on the drawings. The antenna bracket was shown on Drawing A33 for Roof Section H, not Section G where this bracket was found. Therefore, you are due compensation; however, the 15 hours in your claim for removal of six bolts and plugging the hole are considered unreasonable. The Government estimate for this effort is $224.00.

***You are therefore entitled to$224.00 for this item.***

**Item 19. Raise Height of Small A/C on Radio Room, Roof G - CP #48 - $2,613.00**
Total compensation was provided for this in Modification P00007, Page 4, Item e. No additional compensation is due.

**Item 20. Replace Damaged Door with Plywood - CP #50 - $337.00**
You state that Government personnel broke the contractor's seal on the door at the stairwell entrance on Penthouse #6, resulting in the door blowing off its hinges. You installed plywood over the door opening, as was discussed and agreed at a meeting on March 20, 2001, at a cost of $337.00. The Government agrees.

***You are, therefore, entitled to recover your cost of $337.00.***

**Item 21. Crack in Deck of Roof C - CP #51 - $1,452.00,**
**Item 25. Leak Clean up Due to Night Work - CP #69 - $758.00, and**
**Item 39. Crack in Concrete Deck of Roof E - CP #85 - $30,685.00**

These three claim items are all based upon similar factual situations and legal theories. Specifically, you allege that numerous areas of the roof of Building W-143 contained

unexpected cracking in the concrete, which allowed water to leak into the building. Consequently, the leaks had to be repaired, damage from the leaks had to be corrected, and additional work was required to make the concrete roof watertight. You allege that these cracks constituted differing site conditions and that you should be compensated for the cost of correcting resulting damage.

Pertinent contract provisions are:

> FAR CLAUSE 52.236-2 DIFFERING SITE CONDITIONS (APR 1984)
> "(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of -
>
> (1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or
>
> (2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.
>
> (b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly."
>
> SPECIFICATION SECTION 02220 SITE DEMOLITION, Paragraph 3.1.2 Roofing, states, in part, "Sequence work to minimize building exposure between demolition and new roof materials installation. Install temporary roofing and flashing as necessary to maintain a watertight condition throughout the course of the work."
> Paragraph 3.1.2.1 Reroofing, mandates that "… when removing the existing roofing system from the roof deck, remove only as much roofing as can be recovered by the end of the work day … any opening [in the roofing system] made shall be resealed prior to suspension of work the same day."
>
> NAVFAC Dwg. No. 4384980, Sheet A3, General Note 2 states, "The contractor shall maintain the watertight integrity of the roof at all times."

For Item 21 -You contend that due to leaks that occurred in Cell "C" near penthouse #7, you had to install an additional base sheet over an area of 25'x35' after you had glaze coated the area to provide watertight integrity to the roof. The Government believes that you failed to maintain a watertight condition of the demolished roofing areas, which is clearly a contract requirement, that the alleged leaks occurred due to poor workmanship in applying the glaze coating. Furthermore, you failed to notify the Government prior to in stalling the base sheets, as required by FAR Clause 52.236-2 Differing Site Conditions.

For Item 25 - You claim that this leak occurred because of a Government-directed nightshift tear-off. You recognize that, in general, the contractor is responsible for the efforts to watertight the roof and, had the tear-off been during the day, you would not request adjustment for the leak. You maintain that since it occurred at night at the direction of the Government, then the Government is responsible for the leak. The Government does acknowledge directing the contractor to accomplish night demolition on Cell E in the June 2001 timeframe due to numerous safety problems you had that were endangering the occupants of the building. You were compensated for this night shift work under Modification P00007, Item o., page 4, in the amount of $7,016.00. You have provided no specific date that the leak occurred. Based on the timeframe of the night shift work, the leak occurred in June 2001. Since there were various leaks during this time frame, the Government cannot ascertain the facts surrounding this specific incident, and as in Item 21 above, you failed to notify the Government as required by FAR Clause 52.236-2 Differing Site Conditions.

For Item 39 - You claim that the concrete deck on Cell E was laden with spider web like cracks/fractures and that some unidentified holes in the concrete deck not shown on the plans were found under the existing roofing upon demolition. As a result of these conditions, you installed two layers of base sheet hot mopped in with asphalt, in an effort to rectify the leak problems until you could install the roofing system. You allege that these are unforeseen roof defects and that you are entitled to additional compensation as this work is beyond normal to achieve water tightness. You also claim that you notified the Government that this was a changed condition; that the Government acknowledged this and directed you to do the work for which the Government agreed it would adjust the contract at a later time; and that the Government then took the position

that it was not a changed condition. In actuality, your RFI dated 30 August 2001 informed the ROICC that the concrete roof deck on cell "E" had numerous areas with spider web cracks and that you had installed two layers of base sheet in hot asphalt as a "temporary roof" and that the cost for this effort was forthcoming. The Government replied on 23 October 2001 that you were never given direction to install two layers of base sheet – that this is a contractual responsibility on your part to maintain a watertight roof at all times. Again, you failed to notify the Government of what you purported to be a differing site condition until after you had taken steps to rectify the problem.

In order to present a successful claim for differing site conditions, a contractor must show the following:

- o The contract documents must have affirmatively indicated or represented the subsurface conditions that form the basis of the claim;
- o The contractor must have acted as a reasonably prudent contractor in interpreting the contract documents;
- o The contractor must have reasonably relied on the indications of subsurface conditions in the contract;
- o The subsurface conditions actually encountered, within the contract site area, must have differed materially from the subsurface conditions indicated in the same contract area;
- o The actual subsurface conditions encountered must have been reasonably unforeseeable; and
- o The contractor's claimed excess costs must be shown to be solely attributable to the materially different subsurface conditions within the contract site.

Your claim addresses none of these; in fact, cracks within a large concrete slab such as this are not unforeseeable, since concrete is porous and will develop cracks. We believe that the cracks in the concrete slab would not have become an issue if you had performed the roof repairs in accordance with the requirements of the contract. In other words, the "unknown condition" of the concrete roof was not the proximate cause of the leaks. The leaks were a direct result of your failure to perform in accordance with the contract requirements.

Of primary relevance to this issue is the fact that Specification Section 02220, Para. 3.1.2.1, "Reroofing" mandated that "when removing the existing roofing system from the roof deck, remove only as much roofing as can be recovered by the end of the work day … any opening [in the roofing system] made shall

be resealed prior to suspension of work the same day." Another, more general specification, Section 02220, Para. 3.1.2, "Roofing", is also relevant. That specification states that the contractor must "sequence work to minimize building exposure between demolition and installation and new roof materials installation. Install temporary roofing and flashing as necessary to maintain a watertight condition throughout the course of the work". Similar guidance was also provided on the contract drawings.

Had you performed in accordance with the contract by removing only amounts of roofing system that could be replaced in one day, and by installing temporary roofing over the concrete roof to maintain the watertight integrity of the roof, the leaking would not have occurred.

Therefore, no entitlement is due for these issues.

**Item 22. Removal of Additional Asphalt – CP #52 – $129,524.00**

Total compensation was provided for in: Undefinitized Unilateral Modification P00004, (in the NTE price of $150,000.00, funded at 50% of the NTE amount, $75,000.00) as definitized in Modification P00007 for the remaining $54,524.00 – for a total amount of $129,524.00. Therefore, no additional entitlement is due.

**Item 23. Cancellation of Roof Cells D and F – CP #53 – ($239,144.00)**

This claim item concerns disagreement in the amount of credit due the Government for the deletion of Roof Areas D and F from the contract. You claim that the Government is due a credit of only ($239,144.00).

During good faith negotiations held on 4 and 5 October 2001 a credit of ($304,000.00) was agreed upon, including subcontractor pricing in the amount of $21,810.00, even though your proposed credit at the time was ($249,065.00). In that proposal you indicated that substantial manhours would be saved by the deletion of the referenced work. Of particular note were hours that you estimated would be saved by your foreman, forklift operators, and laborers. Standard mark-ups were utilized as audit results had not been finalized. It was also agreed during negotiations that the credit of ($304,000.00) would be adjusted upward or downward based on the results of the Defense Contract Audit Agency (DCAA) Audit. Audited "actual" rates were then received which were much higher than the rates used in

preparation of your initial proposal. Application of the actual rates resulted in a credit of ($361,813.00), which was much higher than you had anticipated. This credit was issued under Item k., Definitization of P00002, in Modification P00007.

You later, however, rescinded that agreement. In your claim amount of ($239,144.00) for this item, your labor hours were markedly reduced, and you included no subcontractor work, which is not reasonable. The Government position is that the negotiated labor hours in your initial proposal were more reasonable than the later far reduced amounts subsequently submitted in your claim. Therefore, we have determined that your initial proposal should be accepted, as is, with the exception that audited rates and the negotiated subcontractor costs must be applied, resulting in a credit of ($312,290.00) in lieu of the ($361,813.00) issued in Modification P00007, a difference of $49,523.00.

***Therefore, you are entitled to this difference of $49,523.00.***

**Item 24. Exterior Stairwell - CP #68 - $36,221.00**
Total compensation was provided for this in Modification P00007, "Fabricate and install steel stairway on the exterior of penthouse 9/11 on roof cell "L", in the amount of $36,221.00, Item l. Definitization of P00002. Therefore, no additional entitlement is due.

**Item 25. (See Items 21, 25 and 39, page 7 hereto)**

**Item 26. Parapet Protrusion Dyna-Clad - CP #71 - $489.00**
Total compensation in the amount of $489.00 was provided in Modification P00007, Page 4, Item g. "Remove protrusion to enable installation of Dyna-clad flashing". Therefore, no additional entitlement is due.

**Item 27. Pitch Pockets - CP #72 - $710.00**
Modification P00007, Item e. under Definitization of P00002, provided total compensation in the amount of $710.00 for this item, "Install 4 pitch pockets on penthouse 9 and 11". No additional entitlement is due.

**Item 28. Anchor Bolts for Signage - CP #73 - $2,445.00**
Total compensation in the amount of $2,445.00 provided by Modification P00007, Item h. on page 4, "Replace anchor bolts and sleeves for signage at east and west end of building". No additional entitlement is due.

**Item 29. Roof K Dyna-clad - CP #74 - $26,962.00**
Modification P00007, Item i., page 4, provided total compensation in the amount of $26,962.00 for this item, "Install Dyna-Clad wall flashing on roof cell "K". Therefore, no additional entitlement is due.

**Item 30. Fabricate and Install HVAC Stands and Enclosures - CP #75 - $17,890.00**
Total compensation for this item in the amount of $17,890.00 was provided in Modification P00007, Item b. under Definitization of P00001. No additional entitlement is due.

**Item 31. Low Spots - CP #76 - $78,151.00**
Total compensation in the amount of $78,151.00 for this item was provided in Modification P00007, Item c. under Definitization of P00002, "Provide Dynabase or similar material and/or perlite on Roofs I, G, C, J, E and H". No additional entitlement is due.

**Item 32. Expansion Joint Repairs - CP #77 - $48,411.00**
Modification P00007, Item j., Definitization of P00002, provided total compensation in the amount of $48,411.00 for this item. No additional entitlement is due.

**Item 33. Application of ASTEC - CP #78 - $26,470.00**
Total compensation in the amount of $26,470.00 was provided in Modification P00007, Item j., page 4. Therefore, no additional entitlement is due for this item.

**Item 34. Shoring CASU - CP #79 - $1,382.00**
Modification P00007, Item k., page 4, provided total compensation in the amount of $1,382.00 for this item, "Provide shoring for abandoned pipe in CASU office under roof cell "E". No additional entitlement is due for this item.

**Item 35. Cut Off Steel PH Ladders - CP #80 - $3,323.00**
Modification P00007, Item l., page 4, provided total compensation in the amount of $3,323.00 for this item, "Cut off steel platforms and reattach on top of penthouse ladders to make room for blocking and coping." No additional entitlement is due for this item.

**Item 36. Deteriorated Brick - CP #81 - $1,951.00**
Modification P00007, Item m, page 4, provided total compensation in the amount of $1,951.00 for this item, "Replace deteriorated brick at door frames of penthouses." No additional entitlement is due for this item.

**Item 37. Relocate Crane - CP #83 - $349.00**
Total compensation in the amount of $349.00 was provided for this item in Modification P00007, Item n, page 4. Therefore, no additional entitlement is due.

**Item 38. CONEX Boxes - CP #84 - $9,561.00**
You claim that the Government directed you to provide three CONEX boxes for material storage, two of which were to be heated. You also allege that the decision to prohibit the use of Elevator #6 forced you to use the boxes, a cost you would not otherwise have incurred.

Pertinent contract provisions are:

SPECIFICATION SECTION 01500 TEMPORARY FACILITIES AND CONTROLS
Paragraph 1.5.1 Storage Size and Location states, "The site available for storage shall be confined to the indicated staging area. Storage on the roof of W-143 shall be confined to the area adjacent to the immediate work area and shall be limited to materials that will be used within 30 calendar days. Storage requirements exceeding the areas described shall be provided by the contractor."

SPECIFICATION SECTION 07220 ROOF AND DECK INSULATION
Paragraph 1.3.2 Storage and Handling, states in part: "Store [materials] in an enclosed building or trailer that provides a dry, adequately ventilated environment. Store felt rolls on end. For 24 hours immediately before application of felts, store felts in an area maintained at a temperature no lower than 50 degrees F."

SPECIFICATION SECTION 07511 BUILT-UP ASPHALT ROOFING
Paragraph 1.4.2 Storage "Protect material against moisture absorption. Store roll materials in enclosed buildings or trailers with adequate ventilation. For a 24-hour period immediately prior to application, maintain roll materials at temperatures above 50 degrees F. Place only those materials to be used during one days work on the roof at a time."

NAVFAC Dwg. No. 4384971, Sheet T1, Location Map, shows the location of the contractor's staging area

NAVFAC Dwg. No. 4384980, General Work Note 13 states, in part "The contractor shall be allowed to use the designated

staging area shown on Drawing T1 for storage and general staging."

You contend that since Elevator #6 could not be utilized for the transport of material, that the Government requested you to provide three CONEX boxes, two of which were to be heated, to pre-stage material in an effort to minimize production delays. Your argument is based on an RFP in the form of an email from the Government dated October 31, 2000, regarding rental of two containers for storage of roofing materials on the roof of W-143. This email was the result of discussions on how the Government could facilitate getting quantities of material to the roof and the idea was that material could be put in the CONEX boxes and lifted to the roof. However, this idea was later rejected as impossible, due to the size of the crane required to lift the extreme weight of the boxes. Once the idea was abandoned, there was no further communication from the Government and no direction to States to procure the boxes.

Your allegation that the need to procure the boxes was created by the restrictions on using Elevator #6 is not valid. The contract required you to store building materials out of the elements and at temperatures above 50 degrees for 24 hours prior to use. These storage conditions could not be met without some sort of storage container at the site, as contract performance began in November, when temperatures routinely dip below 50 degrees.

The contract drawings indicate a staging area for material storage and contractor operations. The specifications tell you that you are not allowed to store materials in the building, and that you are to provide an enclosed building or storage trailer for material storage, including temperature regulated storage for roofing felts. As you were required by the contract to provide some sort of storage container for the roofing materials, the procurement of the CONEX boxes is not the responsibility of the Government, and this item is denied in its entirety.

**Item No. 39. Cracks in Concrete Cell E (See Items 21, 25 and 39, Page 7)**

**Item No. 40. Night Shift for Demolition of Roof Cell E - CP #87 - $7,016.00**

Total compensation in the amount of $7,016.00 was provided by Modification P00007, Item o., page 4. Therefore, no additional entitlement is due.

**Item No. 41. Modify Insulation - CP #88 - $545.00** Modification P00007, Item p., page 4, provided total compensation in the amount of $545.00. Therefore, no additional entitlement is due.

**Item No. 42. Fabricate and Install Two New HVAC Enclosures - CP #90 - $1,378.00** Total compensation in the amount of $1,378.00 was provided by Modification P00007, Item q., page 4. Therefore, no additional entitlement is due.

**Item No. 43. Nine Protrusions in Roof - CP #91 - $1,025.00** You were totally compensated for this item, in the amount of $1,033.00 in Modification P00007, Item r., page 4. Therefore, no additional entitlement is due.

**Item No. 44. Pitch Pockets for #26 - CP #92 - $1,257.00** Total compensation was provided for this item, in the amount of $1,257.00 in Modification P00007, Item s., page 4. No additional entitlement is due.

**Item No. 45. Fabricate and Install Flash Enclosure - CP #93 - $1,594.00**
Modification P00007, Item t., page 4, provided total compensation in the amount of $1,594.00 for this item. No additional entitlement is due.

**Item No. 46. Spalled Areas - CP #94 - $385.00** Total compensation in the amount of $385.00 was provided by Modification P00007, Item u., page 4: "Repair spalled concrete on inside of parapet wall on roof cell I". No additional entitlement is due.

**Item No. 47. Modify Overhead Doors - CP #95 - $2,504.00** Modification P00007, Item v., page 4, for this item, provided total compensation in the amount of $2,504.00. No additional entitlement is due.

**Item No. 48. Surplus Material and Equipment - CP #95 - $6,236.00**
You claim that when the Government cancelled the work for Cells "D" and "F" it failed to provide direction to you for disposition of the surplus material and equipment left on site. As a result, you had to store the surplus material and equipment in a rented container on site and in your company warehouse; and that you incurred additional labor costs in transporting the surplus material to the storage areas, as well as costs for

transporting the surplus material to vendors and in restocking fees. You state that the roofing system has been complete since 30 August 2001 with the surplus material and equipment stored in the job site rented container and in your warehouse.

This claim item actually consists of two components. The first is the bulk material such as roof insulation and rolled goods that you had already procured to accomplish Cells "D" and "F" when the Government decided to delete those cells from the contract. The second is the material that was left on site stored in a CONEX box and the new exhaust hoods that were stored on the loading dock at the facility.

*Bulk Material:* The Government position is that you were paid for the re-stocking/transportation/storage when the credit for the deleted work was negotiated [(Claim Item 23) See lines 21 and 22 of your modification proposal]. The calculation of the credit to the Government for the deleted work was reduced by a significant amount to compensate you for "restocking" charges you might encounter when returning unused materials. This amount remained constant throughout the various proposals for Item #23 and resulted in a reduction of the credit to the Government of approximately $16,000.00. You failed to present any evidence regarding the actual amount of restocking charges you expected to sustain. As was noted previously, in the absence of actual data, competent estimates of costs are the best available method of determining the amount of a change. As no data is provided in your claim, the ROICC method of determining the restocking charge, a 25% reduction in credit for material costs avoided, appears reasonable and competent. In addition, you used that figure in preparing your own proposals, further indicating its reasonableness. Since you were previously compensated for these costs, they should not be again compensated through this second item.

Notwithstanding the fact that you have been paid for restocking charges as outlined above, the audit revealed that the restocking never took place; that you disposed of the material since it was not usable on other jobs and NAVFAC did not want the material. As was noted previously, this allegation will be addressed when the Navy evaluates your "supplemental" claim of 26 August 2004.

*CONEX Box and Labor:* At the time of negotiations for the deletion of cells "D" and "F", the Government intended to keep some material for Government use, which you left on site, based on the hope that in the future this material could be utilized

as Government-furnished material by the Contractor. When the customer concluded that there was insufficient storage space in the compound for the material, you were directed to remove and dispose of the material left on site. Therefore, you are entitled to your costs for this portion of the claim item and should be compensated for labor hours needed to remove the materials and storage container from the roof, as well as storage container rental fees. Your 3-month rental charge could be challenged as the Beneficial Occupancy Date (BOD) of the project was on 6 November 2001, and you were given direction to remove and dispose of the material one-month later on 6 December 2001. However, it had been the intent of the Government to keep possession of this material and you probably could have gotten rid of the material sooner and not incurred the additional cost.

***Therefore, you are entitled to recover your costs in the amount of $822.00 for this portion of Claim No. 48.***

**Item 49. Flashing of Cable Pad - CP #96 - $851.00**
Modification P00007, Item w., page 4, provided total compensation for this item in the amount of $851.00: "Flash cable pad on radio room using 2-part cement and granules. No additional entitlement is due.

**Item 50. Defective Submittal Register - CP #97 - $12,552.00 and a 50-day time extension**
You allege that due to a faulty submittal register included in the specifications you were delayed from starting the project and that you incurred additional costs in reviewing and revising the 12-page submittal register - a total of 272 man-hours - and were delayed some 50 days. Your claim also states that following receipt of the Government's initial submittal register that you notified the Government of discrepancies, and that you were directed to make the necessary changes.

Pertinent contract provisions are as follows:

> SPECIFICATION SECTION 01330 SUBMITTAL PROCEDURES, Paragraph 1.2.1.1 Submittal Register "…Submit with the Quality Control Plan within 15 calendar days after contract award." Paragraph 1.4.1 Transmittal Form. Provides instructions on how to fill out the transmittal form accompanying submittals.

You are correct that the submittal register was inaccurate, but this did not preclude you from providing the required submittals to the Government, and did not prevent you from starting work.

Prior to beginning work the contractor must have an approved 90-day preliminary QC Plan, Safety, Demolition and Asbestos Abatement Plan. None of these plans were submitted in a timely manner. In fact, the earliest of these submittals was received 57 days after award. Your claim that you notified the Government of discrepancies following receipt of the initial submittal register is incorrect. The initial submittal register was provided in the specifications at the time of bidding and, of course, when the contract was awarded, 7 August 2000. Your notification took place approximately 43 calendar days after award, following a "behind schedule" letter sent to you regarding late submittals. Contract Specification Section 01330 Paragraph 1.4.1 provides instructions on how to fill out the transmittal form accompanying submittals.

As you were required to expend time and effort that was not contemplated under the solicitation, you are entitled to compensation. However, the figure you submitted of 272 hours spent in correcting the register is unreasonable. These figures would indicate that it took you 23 hours to correct each page. It normally takes only a few hours to review a submittal register to see if it is correct. It is reasonable to assume that it would only take two days to mark-up and correct the register. Since it is obvious that you were contributing to your own delays, the 50-day time extension is not justified.

***You are, therefore entitled to compensation for 16 hours of time - $739.00***

**Item 51. Addition of Safety Assurance Officer - CP #98 - $53,254.00**

You allege that the Government directed you to provide a full-time Safety Manager on site due to safety problems that were not your fault. You state that the contract does not require a separate Safety Officer and that your safety plan did not indicate one.

You have provided no documentation or proof that you were directed to provide a full-time safety manager on site. In fact, minutes of a meeting of 29 January 2001 indicate that you offered to provide a safety manager to show your willingness to correct past safety problems. Documentation indicates that 37 safety deficiencies were noted in the first 4.5 months of the project. Since you have provided no justification for this claim item, no entitlement is due.

**Item 52. Acceleration - CP #99 - $34,514.00**

You claim that because of changes, changed and differing site conditions, you incurred $34,514.00 in premium/overtime costs when you had not anticipated having to pay any premium or overtime to your workers, and had included no overtime pay in your bid price. You cite three court decisions as justification for what you refer to as acceleration, but fail to provide any back-up as to the applicability of these decisions, and you provide no specific examples of Government direction to accelerate performance.

In order to recover damages for accelerated performance, a contractor must prove several elements of its claim. These elements are, "that any delays giving rise to the order were excusable; that the contractor was ordered to accelerate; and that the contractor in fact accelerated performance and incurred extra costs." *Norair Eng. Corp. v. U.S., 666 F.2d 546 (C.Cl. 1981).* Recent Armed Services Board of Contract Appeals (ASBCA) cases however, have refined these rules, explaining that:

> First, there must be an excusable delay. Second, the contractor must give notice of the excusable delay and specifically request a time extension accompanied by sufficient supporting information to allow the Government to make a reasonable determination concerning how to proceed. Third, the Government must fail or refuse to grant the requested time extension within a reasonable time. Fourth, the Government must order the contractor to accelerate the work, either expressly or by implication, without regard to excusable delay. The contractor must give notice to the Contracting Officer (CO) that the alleged order to accelerate constitutes a constructive change so that the CO is afforded the opportunity to assess the circumstances and take appropriate action to avoid the added costs of the acceleration order. Fifth, the contractor must actually undertake reasonable efforts to accelerate and incur costs.

*Commercial Contractors Equipment, Inc.*, ASBCA 52,931-35, 03-2 BCA, 32,381. The reason for this refinement is that "it would be inherently unjust to hold the Government liable for acceleration costs where it simply did what as far as it knew it was entitled to do, when the contractor had not claimed and reasonably demonstrated entitlement to a longer period to perform." [a case cite from the legal memo should probably go here. If not, I'd just delete the following parenthetical

statement. (Characterized as holding that "contractor cannot fault the Government for not granting a time extension when it never requested one.").

You have presented no evidence to satisfy your claim of acceleration. In fact, the only evidence submitted is the mere fact that you had to pay overtime to your employees. A review of your records reveals that only 844 hours of overtime were expended out of a total of 50,144 hours, or 1.9% of the total man-hours. A review of your certified payrolls revealed that several members of your workforce were working on other jobs at the same time as this contract. These records are reasonably interpreted as the contractor conscientiously imposing overtime in order to keep all of your projects moving. It was, therefore, unreasonable not to have anticipated overtime on this project since you were well aware of the projects you had under contract or pending at the time of your bid.

You have also not presented any evidence regarding the existence of an excusable delay nor that you made a request to the Government for additional time, which request was rejected. Therefore, this portion of your claim is denied.

**Item 53 – General Conditions Time Extension – CP #100 – $87,151.00 and 132 days**

You claim $87,151.00 and 132 days of extension in additional compensation for alleged Government caused delays. While you admit "some of the direct costs associated with these Government responsible delays are included within States' individual cost proposals," you then demand this additional amount. You offer no support for this item; only an allegation that you are due additional sums for field overhead that was not properly calculated by the Government in earlier cost proposals.

It is the position of the Government that you were previously compensated for all delays through earlier modifications. Of the 132 days in this claim item, 50 of the days were previously claimed under your Claim Item 50 addressing the submittal register. Deducting those 50 days from this item, since you should not be claiming the same item twice, leaves a balance of 82 days at issue. The original contract completion date was 17 August 2001 and the Beneficial Occupancy Date (BOD) was 6 November 2001, equating to an extended performance period of 81 calendar days. The Government agrees that you were due extended field overhead as a result of differing site conditions encountered; therefore, compensation for extended field overhead for 81 calendar days was issued under Modification P00007, Item

bb., page 5, in the amount of $32,007.00. That item in P00007 also extended the contract time for completion to and including 15 November 2001, which, incidentally, is nine days beyond the BOD. Your Claim Item 53 then is the difference between the $32,007.00 issued in P00007 and your CP#100 of $87,151.00, or $55,144.00.

The Government position is that you were fully compensated under Modification P00007, except for the following: Your proposal submitted for negotiations included equipment charges totaling $37.97/day and the basis for P00007 by the Government was $35.17/day, a difference of $2.80/day for 81 days, or $227.00. This difference is attributed to the difference in cost of the porta-johns on the site ($2.37/day) and computer support (.43/day). A review of the invoices reveals the daily rate for the porta-john should be $7.00/day, not the $4.00/day compensated under P00007; and that you should be compensated for the computer support cost of .43/day.

***You are, therefore, entitled to an additional $3.43/day for 81 days plus mark-ups , or an additional $356.00 for this item.***

**Item 54. Leak on Roof Deck - CP #101 - $161.00**
You claim that you repaired a roof leak on the Lobby Elevator Penthouse on 30 January 2001, as requested by the activity, in an area that was not a part of the contract. The record reflects that this work was accomplished, even though the Contracting Officer did not direct it nor was the Contracting Officer notified. However, the work was directed by a Government entity, and the proposed material and labor costs are determined to be reasonable.

***You are, therefore, entitled to your cost of $161.00***

**Item 55. Leak Repairs (Roof E) - CP #102 - $1,764.00**
You are claiming costs for leak repairs and for securing a steel pipe hanging from the ceiling in Cell E over the CASU office, which was discovered on 30 May 2001. As for the allegation concerning steel pipe, the Government agrees that you should be compensated for your efforts in securing the pipe. These efforts were taken at the direction of the Government and were not within the scope of the original contract. Also, the existence of this steel pipe was not reasonably foreseeable from the contract documents. However, you have not broken down the costs for this particular item. The Government believes that 33% of the amount claimed for this entire item, or $583.00 appears to be a reasonable price.

It is the position of the Government that the leaks referenced in this item were not unforeseen site conditions, but were directly caused by your failure to waterproof the exposed concrete roof, as required by the contract, and as discussed in Item 21. Therefore, this portion of the claim item is denied.

***You are entitled to $583.00 for the steel pipe portion of this item.***

**Item 56. Clean-up Effort on Bridge – CP #103 - $270.00**
You are seeking compensation for costs incurred in cleaning up water damage on a causeway inside Building W-143. Since the source of the water was found to be a leaking window, the related clean-up was outside the scope of the contract.

***You are therefore, entitled to your costs of $270.00***

**Item 57. Clean-up Leaks in Cell J – CP#104 - $1,694.00**
You claim that you had interior clean-up efforts associated with leaks caused by a hidden field condition at Cell J. RFI's and photographs provided in your claim relate to another part of the roof, not Cell J, and are not related to this claim. You were compensated in Modification P00007, Definitization of P00004, Additional Negotiated Work, Item q. for additional work done on the part of the roof indicated in the supporting documents for this claim. Therefore, no additional entitlement is due.

**Item 58. Clean-Up Efforts, Cell E – CP105 - $2,303.00**
You allege that three 10-inch holes encountered in the concrete roof deck once the asphalt was removed was a source of leaks, and that these leaks caused you to have to accomplish clean up in the office spaces below. Again, the Government position is that your failure to follow the contract and make the roof watertight after demolishing the existing asphalt coating was the proximate cause of the leaks. The Government does agree that you should be compensated for fixing the three holes in the roof that were encountered, but maintains that these holes would not have allowed water into the building if the roof had been properly sealed, as required by the contract. Therefore, no entitlement is due for the clean-up effort.

***You are entitled to a reasonable cost of $360.00 for repairing the holes.***

**Item 59. Clean-up and Tile Replacement, Captain's Elevator – CP #106 - $804.00**

You are claiming costs for interior clean-up efforts and replacing ceiling tile by the Captain's Elevator. You did perform these activities, but the Government maintains that the leaks occurred because of your failure to properly seal areas of demolished roofing/asphalt and not flashing around the elevator penthouse, which caused the leaks to occur. You provided no back up relating to the claim, only copies of invoices. During roof demolition, you made no attempt to seal areas where only exposed asphalt remained. You attempted to seal the area around the penthouse by using spray foam, which did not work. Interviews with the activity indicate that this section of roof did not leak until you began your demolition procedure. Therefore, no entitlement is due for this claim item.

**Item 60. Lobby Skylight Replacement – CP #107 - $3,849.00**

You are seeking compensation for costs incurred in having to replace a skylight in the lobby of Building W-143 that was broken by concrete falling from the roof parapet. You contend that the reason the skylight broke was due to excessive concrete spalling on the building. You claim that this situation should be considered a differing site condition, as more concrete spalling existed than was anticipated at the time of contract award. The elements of a differing site condition claim have previously been set forth in this decision. Your documentation does not support a conclusion of a differing site condition for two reasons. First, this particular spalling was identified in the contract documents, thereby giving notice of the condition. In addition, you were aware of the spalling, as you had set up a tarp beneath this area of the parapet to catch falling concrete. The tarp, however, had not been properly secured, and it allowed the concrete to fall through. Therefore, this portion of your claim is denied.

**Item 61. Equipment Lifts and Stand-By Crane Time – CP #108 - $100,290.00**

In this item, you are apparently claiming the balance of all crane rental charges and crane-related labor charges that were not compensated in Item #1 of this claim. The Government has previously recognized that directing you to use a crane to move materials to the roof of W-143 in lieu of using Elevator #6, was a contract change. This change was memorialized in Modification P00003 and you were fully compensated for the change in Modification P00007, as noted in Item 1 of this claim. The figures used in Modification P00007 to definitize your cost of using cranes reflected the fact that not all of the crane time

026